NOTICE

Decision filed 07/01/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260141-U

NOS. 5-26-0141, 5-26-0142, 5-26-0143,

5-26-0144 cons.

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* JANESSA C., JAYVARION C., JURNEE C., and NESSIAH P.-C., Minors | ) ) ) | Appeal from the Circuit Court of Macon County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 24-JA-89, 24-JA-90, 24-JA-91, 24-JA-97 |
| Jameira C., | ) ) | Honorable Erick F. Hubbard, |
| Respondent-Appellant). | ) ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Hackett concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The circuit court's orders terminating Mother's parental rights were not against the manifest weight of the evidence where the State met its burden of proving that Mother was unfit to parent and that termination was in the best interest of the minors. Therefore, the circuit court's orders making a finding of unfitness and terminating parental rights are affirmed.

¶ 2     The respondent, Jameira C. (Mother), appeals the orders of the circuit court of Macon

County terminating her parental rights to her four minor children.[1] She argues that the circuit

_____

[1]Mother filed separate appeals in each of the minors' cases. This court ordered her appeals consolidated under the case number for Janessa's case.

1

court's orders finding her unfit and terminating her parental rights were against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On June 3, 2024, the State filed petitions alleging that the minors Janessa (born June 2022), Jayvarion (born June 2023), and Jurnee (born August 2020) were neglected and abused.[2] Count I alleged that the minors were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(b) (West 2022)) due to being in an environment injurious to their welfare in that two of the children were left home alone, and the house and children were "filthy." Count II alleged that the minors were neglected pursuant to section 2-3(1)(d) of the Act (*id.* § 2-3(1)(d)) in that the minors were left without supervision for an unreasonable period of time without regard for the mental or physical health, safety, or welfare of the minors that were left alone. Count III alleged that the minors were abused pursuant to section 2-3(2)(ii) of the Act (*id.* § 2-3(2)(ii)) in that any person responsible for the minors' welfare created a risk of physical injury to the minors by other than accidental means which would be likely to cause death, disfigurement, impairment of physical or emotional health, or loss or impairment of any bodily function, because two minors were left home alone.

¶ 5    The Illinois Department of Children and Family Services (DCFS) filed a shelter care report the same day. The report stated that on May 31, 2024, around 12:30 a.m., a law enforcement officer responded to a domestic violence incident. When he arrived, Jayvarion was in the care of a juvenile who was involved in a domestic dispute with her parent. The officer took Jayvarion next door to Mother's house to notify her. Mother was not home, and Jurnee and Janessa were alone and nude in the home. All three minors were transported to the hospital for examination. The officer

---

[2]The fathers of the minors are not parties on appeal.

described the house as "filthy," with cockroaches, feces, and mold. The minors were dirty and covered in feces; one minor was locked in a bedroom. At the hospital, the minors were cleaned and treated. Jayvarion and Jenessa both had diaper rashes, and Jurnee had a double ear infection. Officers made contact with Mother around 3:30 a.m., and she informed officers that she left all three minors with the neighbor around 10 p.m. and checked in with the neighbor "multiple times." Officers took protective custody of the minors at 3:49 a.m.

¶ 6    A shelter care hearing was held on June 3, 2024. Mother appeared and stipulated that there was probable cause to believe the minors were neglected, abused, or dependent. The circuit court entered a temporary custody order the same day, appointing DCFS as the temporary custodian of the minors. Mother was admonished to cooperate with DCFS and comply with all services.

¶ 7    On June 12, 2024, the State alleged that Nessiah (born March 2018) was neglected pursuant to 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2022)) due to being in an environment injurious to her welfare in that her siblings came into care for supervision and environmental issues, and the minor was residing with her grandparents for years despite her grandparents not having legal guardianship over her. DCFS filed a shelter care report the same day, including the same information about Nessiah's siblings and that her grandparents did not have legal guardianship.

¶ 8    A shelter care hearing was also held on June 12, 2024, and after witness testimony and evidence were presented, the circuit court found probable cause to believe the minor was neglected, abused, or dependent due to the minors' siblings cases regarding inadequate supervision, that Nessiah lived with her grandparents who did not have any legal rights over her, and she had complex medical needs. The circuit court entered a temporary custody order, appointing DCFS as the temporary custodian of the minor.

3

¶ 9    On June 26, 2024, all parties were present and waived the adjudicatory hearing. Counts II and III of the petitions for Janessa, Jayvarion, and Jurnee were dismissed. The circuit court entered adjudicatory orders in all four cases on July 1, 2024, finding the minors to be neglected as to count I, due to being in an environment injurious to their welfare in that two of the children were left home alone, and the house and children were "filthy."

¶ 10    A dispositional report for all four minors was filed on July 2, 2024. Janessa, Jayvarion, and Jurnee were all placed together with a relative and were doing well. Nessiah was placed with her great-grandparents and was doing well. The report noted that she had a "severe case of Cerebral Palsy." A dispositional hearing was held on July 10, 2024, during which Mother failed to appear and was defaulted. The circuit court entered a written order on July 16, 2024, making the minors wards of the court and finding Mother unfit. The order stated that Mother needed to engage in services and address the lack of supervision and filth in the home. The Guardianship Administrator of DCFS was appointed.

¶ 11    The Webster Cantrell Youth Advocacy agency (WCYA) filed a permanency report on December 30, 2024. The report stated that Mother was not compliant with the terms of her service plan. Her services included mental health assessment, substance abuse assessment, domestic violence, parenting, weekly random drug screens, and visitation. She was noncompliant in all areas. Mother attended some parenting classes, but not all. She was dropped from domestic violence classes for not attending the initial appointment. She only attended one weekly drug screen on July 5, 2024, which was positive for marijuana. Mother was combative with the foster parent during visits with Janessa, Jayvarion, and Jurnee, so the visits were moved to the WCYA agency. She did not attend visits from July to September 2024. From September to December 2024, Mother did not attend 12 of the offered 14 visits with Nessiah. At the two she did attend,

she did not provide the proper supplies and needed help taking care of Nessiah. Mother did not attend 10 of the offered 12 visits with Janessa, Jayvarion, and Jurnee. At the two she did attend, she needed help taking care of the minors. Mother maintained "sporadic contact" with the caseworker and had not corrected the conditions in her home to permit home visits. The recommended goal was return home within 12 months to allow Mother time to complete her services and correct the conditions that brought the minors into care.

¶ 12 The circuit court held a permanency review hearing on January 8, 2025. Mother did not attend. The court adopted a permanency goal of return home within 12 months, finding that Mother did not make reasonable and substantial progress or reasonable efforts toward returning the minors home.

¶ 13 WCYA filed a permanency review report on June 16, 2025. It stated that Mother was not compliant with her service plan during the period from January 2025 through the date of the report. She completed the mental health and substance abuse assessments. She was unsuccessfully discharged from domestic violence, as she refused to complete the initial assessment. She only attended parenting classes sporadically, and she only completed one drug screen on July 5, 2024. Mother only attended 6 out of 35 supervised visits with Janessa, Jayvarion, and Jurnee, and 2 out of 35 supervised visits with Nessiah. When questioned about why she did not attend visits, Mother told the caseworker that she would only attend when she could bring food and that visits with Nessiah were "entirely too boring" at her placement's house. Mother stated that she wanted to surrender her rights to Nessiah more than once. Mother was also homeless and recently employed. She was uncooperative with WCYA staff regarding the case. The recommended goal remained return home within 12 months.

¶ 14    On June 25, 2025, the circuit court held a permanency review hearing and changed the goal to substitute care pending court determination of parental rights. The written order found that Mother did not make reasonable and substantial progress, or reasonable efforts toward returning the minors home. The goal was supported due to Mother's failure to engage in services.

¶ 15    The State filed a motion seeking a finding of unfitness and termination of Mother's parental rights on July 1, 2025. The motion alleged that Mother was unfit in that she failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, pursuant to section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2024)); failed to make reasonable efforts to correct the conditions that were the basis for the removal of the minors from Mother during any nine-month period following the adjudication of neglect pursuant to 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)); and failed to make reasonable progress toward the return of the minors to Mother during the following time periods: June 26, 2024, to March 26, 2025, and October 1, 2024, to July 1, 2025, pursuant to 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 16    The matter proceeded to a fitness hearing on October 27, 2025.[3] Mother did not appear for the hearing and did not inform her counsel of the reason for her absence. The State called Shawna Spence, a WCYA caseworker assigned to Mother's case. Spence testified that Mother's services included a mental health assessment, substance abuse assessment, domestic violence, parenting, visitation, and weekly random drug screens. Mother completed mental health and substance abuse assessments, and no further services were needed. Mother completed 1 drug screen out of 20 during the life of the case. Mother never completed the initial assessment for domestic violence, so she was dropped from the service. Spence testified that Mother was "unsuccessfully discharged"

---

[3]A default order for unfitness and termination of parental rights was entered against Mother on July 23, 2025, due to her failure to appear for the hearing. Upon a motion from her counsel, the judgment was vacated on September 30, 2025.

for not attending parenting classes. Spence confirmed the information regarding visitation from the June 16, 2025, permanency report, as described above. Mother only attended visitation twice with the minors in 2024. Spence opined that the minors would not be able to return to Mother's case in the reasonably near future.

¶ 17    On cross-examination from Mother's counsel, Spence testified that Mother was not rereferred to domestic violence services after she failed to complete the intake because she informed Spence that she was not going. Mother lived an hour away from the initial assessment, but never stated she had issues with transportation. As to visitation, Mother told Spence that she did not attend because "her kids did not eat certain foods, and she didn't have food to bring." Spence suggested getting food from a food bank, but Mother said the minors would not eat it.

¶ 18    The parties presented no further witnesses or evidence. The State argued that Mother "did almost nothing of what she was asked by the agency to engage with to restore her children to her." Mother failed to maintain a reasonable degree of interest, concern, or responsibility for the minors due to her lack of visitation and services. Mother further failed to make reasonable efforts and progress during either nine-month period alleged. Mother completed her assessments only toward the end of the period from June 26, 2024, to March 26, 2025. During the October 1, 2024, to July 1, 2025, time period, Mother "engaged in the bare minimum visitation" with the minors. The State argued that Mother failed to engage in two of her major services and failed to do drug screenings.

¶ 19    The circuit court found that the State proved by clear and convincing evidence that Mother was an unfit parent as to each ground alleged by the State. The court said that throughout the time periods in question, there was "really very, very little effort" from Mother, as she did not engage in services and had an "abysmal record" for visitation.

7

¶ 20 On November 14, 2025, WCYA filed a best interest report for the minors. Nessiah was placed with her great-grandparents and had been in their care since she was an infant. She had cerebral palsy and her great-grandparents were meeting all her medical needs, as well as all other areas of her care. She had a sense of attachment to them, and she was well adjusted. They had committed to providing Nessiah permanency and provided all documentation for an adoption referral. Nessiah had not seen Mother since November 15, 2024. Janessa, Jayvarion, and Jurnee were all placed together with their maternal grandmother. All three minors' health improved during their placement due to proper diagnoses and treatment of their health issues. Each minor was enrolled in therapies to address their individual needs, and all were reported to have improved during their placement. The minors adjusted well to their placement and felt safe, and the foster parents were committed to providing permanency for them. The minors had not seen Mother since February 14, 2025. WCYA recommended that Mother's parental rights be terminated and the goal be changed to adoption for all four minors.

¶ 21 The matter proceeded to a best interest hearing on December 15, 2025. The State called caseworker Spence from WCYA to testify. She first testified to Nessiah and her placement. Nessiah was placed with her great-grandparents, and she had lived with them since she was three and a half months old. Nessiah was medically complex with cerebral palsy and her great-grandparents were capable of meeting all her medical needs. They also maintained her relationship with her siblings. Nessiah was nonverbal, but Spence testified she could tell Nessiah was bonded to her foster parents in the way she looked at them and interacted with them. Spence had no concerns about Nessiah's placement.

¶ 22 Jurnee was doing well and attending school. She was placed with her maternal grandmother, and Jurnee's aunt helped care for her while her grandmother worked. Jurnee got

along well with her siblings, and there were no issues in the home. Jurnee was bonded with her grandmother, who worked to address her developmental disabilities through occupational and speech therapy. Jurnee had been improving with her delays. As to Janessa, she was doing well in her placement with Jurnee and Jayvarion. Janessa was "stubborn," but her grandmother was able to handle this. Janessa was in prekindergarten, and she was also enrolled in occupational and speech therapy to address her developmental delays. Jayvarion was very close with Janessa. He also had developmental disabilities, and he received speech therapy. He was bonded with his grandmother as well. Spence recommended that Mother's parental rights be terminated and the minors be placed with their foster families.

¶ 23    On cross-examination from Mother's counsel, Spence testified that she observed the visits between Mother and the minors, but she did not observe a bond between them. Mother struggled to handle the minors during visits. Mother still had barriers remaining, such as housing, and finishing her services of parenting, domestic violence, drug screens, and visitation. Mother did complete the substance abuse assessment, but was not recommended for treatment. Spence was not sure how long it would take for Mother to complete her remaining services because she was discharged from all of them for not participating. Spence was not sure if the foster parents would agree to guardianship; Mother did mention it previously but never addressed it further. The State presented no further evidence or testimony.

¶ 24    Mother then testified on her own behalf. Mother testified that she was moving to a house near the WCYA agency the following month, and she was going to be employed by Caterpillar as a forklift driver. Mother stated that she would agree to guardianship of the minors, and she previously spoke with Nessiah's placement about it. Mother testified that for her parenting services, she had difficulty attending and taking phone calls from the agency due to her

9

employment. When she arrived late to the parenting class, she was unable to attend, and she lost her job because of it. She testified that she received no help and was homeless. Mother stated that she had been "trying to visit" the minors since October 2024, but the agency would not allow the visits to occur if she was late. She also would not attend a visit if she did not have food for the minors. Mother said the minors were excited to see her when the visits occurred, and cried when they ended. She said the visits generally went well. Mother testified that she would redo her services if the permanency goal was changed to return home. The parties presented no further evidence or testimony.

¶ 25     The State argued that the minors came into care in June 2024, and a year and a half into the case, Mother still had not completed her services and was "not close" to having the minors returned to her. The minors were in stable placements and were bonded with their foster families. The State argued that guardianship would not be appropriate due to Mother's participation in the case so far, and instead, based on the best interest of the minors, her parental rights should be terminated.

¶ 26     Mother's counsel stated that "the evidence here does largely suggest that the children are being well taken care of" in their placements, but the court should consider the factor of the continuity of relationships instead of termination. Counsel argued that the goal should be guardianship because the minors would remain with the same caretakers and have the "level of permanency." Guardianship would also be "faster" in getting the minors permanency because Mother would agree to guardianship, but would likely appeal any findings as to adoption. Mother would try to do everything necessary to reengage, and counsel asked for the court to consider guardianship instead of termination.

¶ 27    The guardian *ad litem* (GAL) testified that she was in agreement with the State. All of the minors' needs were being met in their current placements, and the GAL asked for termination of parental rights.

¶ 28    Upon inquiry from the court, Mother's counsel confirmed that Mother testified that Nessiah's placements agreed to guardianship, but the other three minors' placement did not have a conversation with Mother about guardianship. Spence stated that when she spoke with both placements prior to the hearing, they did not support guardianship, and there was never a conversation with Nessiah's placement about it either. The State suggested continuing the best interest hearing in order to obtain additional details about the possibility of guardianship. The circuit court bifurcated the best interest hearing to address guardianship with additional testimony.

¶ 29    The matter proceeded to the continued best interest hearing on March 20, 2026. Mother did not appear. James C. testified as the foster parent of Nessiah. He stated that Nessiah had lived with him for seven years and six months, he wished to adopt her, and was not willing to agree to guardianship. James stated that his wife was in agreement with his position. Raynesse C. testified as the foster parent of Janessa, Jayvarion, and Jurnee. She was Mother's mother. Raynesse stated that she had known the minors their entire lives, and that she was only open to adoption, not guardianship.

¶ 30    The State argued that the foster parents would like to adopt the minors, and they have had loving relationships with them their entire lives due to their familial relationships. It would be in the best interest of the minors to terminate Mother's parental rights. The GAL agreed.

¶ 31    The circuit court stated that it considered the best interest report and testimony from the best interest hearing to weigh the best interest of the minors. Nessiah lived with her great-grandparents since she was three and half months old and was medically complex. She was bonded

11

with her placement, and the following factors favored her placement: sense of security, familiarity, continuity of affection, the least disruptive placement, feeling valued and loved, familial ties, and the need for permanency, stability, and continuity of relationships. The same factors applied to Janessa, Jayvarion, and Jurnee in their placement with their grandmother. Additionally, the physical safety, welfare, medical and health needs, and attachment were being met with their placement.

¶ 32    The circuit court entered written orders for each minor on February 4, 2026, as to parental fitness and termination. Mother was found unfit on all grounds alleged in the petition, and her parental rights to the minors were terminated. Mother timely appealed.

¶ 33                                      II. ANALYSIS

¶ 34    On appeal, Mother argues that the circuit court's findings of unfitness and termination of her parental rights were against the manifest weight of the evidence.

¶ 35    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Act (705 ILCS 405/2-29(2) (West 2024)), which delineates a two-step process to terminate parental rights involuntarily. The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). 705 ILCS 405/2-29(2), (4) (West 2024); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). If the court finds the parent unfit, the matter proceeds to a second hearing at which the State must prove that termination of parental rights is in the child's best interest. 705 ILCS 405/2-29(2) (West 2024); *In re D.T.*, 212 Ill. 2d at 352.

¶ 36    Our courts have recognized that parental rights and responsibilities are of deep importance and should not be terminated lightly. *In re D.T.*, 212 Ill. 2d at 364. Thus, parental rights may be terminated only after a finding of unfitness that is supported by clear and convincing evidence. *Id.* A finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). This court, therefore, does not reweigh the evidence or reassess the credibility of the witnesses. *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 37                                                A. Unfitness

¶ 38    In this case, the State alleged three grounds for unfitness: failure to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b) (West 2024)); failure to make reasonable efforts to correct the conditions that were the basis for removal of the minor during any nine-month period (*id.* § 1(D)(m)(i)); and failure to make reasonable progress to correct the conditions that were the basis for removal of the minor during the nine-month period of June 26, 2024, to March 26, 2025, and October 1, 2024, to July 1, 2025 (*id.* § 1(D)(m)(ii)).

¶ 39    Reasonable progress is judged by an objective standard based on the amount of progress measured from the conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. At a minimum, reasonable progress requires measurable or

13

demonstrable movement toward the goal of reunification, and reasonable progress exists when the circuit court can conclude that it will be able to order the child returned to parental custody in the near future. *Id.* However, a parent does not have an unlimited amount of time to make reasonable efforts or progress toward the return home of his children. *In re Grant M.*, 307 Ill. App. 3d 865, 871 (1999).

¶ 40   The State alleged two time periods in its petition for unfitness and termination, but the time periods overlap by six months. However, this is not an issue because the circuit court found Mother to be unfit for both time periods, covering a total of 11 months. During both time periods, Mother only completed 1 drug drop out of 20, did not enroll in domestic violence services, did not participate in parenting classes, and visited the minors 8 times out of a total of 70 offered visits. The circuit court stated that Mother had "very little by way of engagement in services" and "an abysmal record insofar as visitation goes and [drug] drops go." When Mother did attend visits, the notes stated that she struggled with the visits, including not being capable of handling the minors. The visitation notes show that Mother frequently failed to attend or confirm visits.

¶ 41   Mother argues that her progress was reasonable "given her particular circumstances" and she should have been granted "at least some time to reengage and to complete what was necessary." Mother did not testify at the unfitness hearing as to what the "particular circumstances" would be that could have prevented her engagement in the case. Mother was previously defaulted at the unfitness hearing, and the circuit court vacated that finding, yet Mother did not attend when the matter was reset. The circuit court did not have any evidence or testimony from Mother as to her fitness. The State's witness, however, testified that, in her opinion as the caseworker, DCFS would not be able to return the minors to Mother's care in the reasonably near future. See *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

14

¶ 42   Based on these facts, the circuit court determined that the State proved by clear and convincing evidence that Mother failed to make reasonable progress during the relevant nine-month period. Evidence of a single statutory ground is sufficient to uphold a finding of parental unfitness. *In re T.Y.*, 334 Ill. App. 3d 894, 905 (2002). Accordingly, we conclude that the circuit court's finding that Mother was unfit was not against the manifest weight of the evidence. Because we may affirm the circuit court's finding of unfitness on this ground alone, we need not address Mother's remaining arguments concerning the other statutory grounds for her unfitness. See *In re Gwynne P.*, 215 Ill. 2d at 363.

¶ 43                                    B. Best Interests

¶ 44   Once the court makes a finding of unfitness, "[t]he issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d at 364. The parent's interest in maintaining the parent-child relationship "must yield to the child's interest in a stable, loving home life." *Id.* At this stage of the termination proceedings, the State bears the burden of proving by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 31.

¶ 45   In making a best interest determination, the court must consider, within the context of the child's age and developmental needs, the following factors:

> " '(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's familial, cultural[,] and religious background and ties; (4) the child's sense of attachments, including love, security, familiarity, continuity of affection, and the least disruptive placement alternative; (5) the child's wishes and long-term goals; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parent figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the person available to care for the child.' " *Id.* ¶ 32 (quoting *In re Daphnie E.*, 368 Ill. App. 3d at 1072).

15

See 705 ILCS 405/1-3(4.05) (West 2024).

¶ 46    As with the circuit court's findings at the unfitness stage, we afford the circuit court great deference, as it is in a superior position to view the witnesses, assess their credibility, and weigh conflicting evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. We will not reverse the circuit court's best interest determination unless it is against the manifest weight of the evidence. *Id.*

¶ 47    Mother argues on appeal that the circuit court erred in finding it was in the minors' best interest to terminate her parental rights. Mother argues that the minors were "excited to see her and cried when the visits were over." However, her brief states, "there was not much evidence given by [Mother] to support her position" and "all four children seem to be bonded to their grandparents, well-taken care of, and in a safe stable environment."

¶ 48    The circuit court's best interest determination was supported by the record and was not against the manifest weight of the evidence. The minors had two different placements. Nessiah was with her great-grandparents, who had cared for her since she was three and a half months old. Nessiah had cerebral palsy and required special medical care. Her placement was capable of taking care of all her needs medically, physically, and emotionally. They supported her through multiple available services to address her issues and adjusted their lives to fully care for her. The circuit court detailed the factors it considered when determining that Nessiah's placement was in her best interest, as discussed above. Janessa, Jayvarion, and Jurnee were placed with their grandmother, who also met their needs. All three minors had developmental disabilities, and their placement worked to enroll them in services and educational opportunities to address their issues. All four minors had familial placements, which maintained their family ties and involved them in their communities. The placements also encouraged sibling visits for all four minors. The circuit court also relied upon the evidence presented by the State to address the best interest factors applicable

16

in the foster placement's favor, including sense of security, familiarity, continuity of affection, the least disruptive placement, feeling valued and loved, familial ties, and the need for permanency, stability, and continuity of relationships.

¶ 49    We find that the State proved by a preponderance of the evidence that termination of Mother's parental rights was in the minors' best interests. The opposite conclusion is not clearly evident. As such, the circuit court's termination of Mother's rights was not against the manifest weight of the evidence.

¶ 50                                III. CONCLUSION

¶ 51    For the foregoing reasons, the circuit court's orders of unfitness and termination of Mother's parental rights are affirmed.


¶ 52    Affirmed.